UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ALI WIDDI**,                                                    Case No. 1:13 CV 1235

                 Plaintiff,                              Magistrate Judge James R. Knepp II

      v.                                                      MEMORANDUM OPINION AND
                                                               ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

                 Defendant.

## INTRODUCTION

Plaintiff Ali Widdi seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms in part and remands in part the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On January 14, 2010, Plaintiff filed applications for SSI and DIB claiming he was disabled due to "back [and] heart problem[s]," and depression (Tr. 151-61, 174). He alleged a disability onset date beginning October 1, 2009. (Tr. 159). His claims were denied initially and on reconsideration. (Tr. 81-84). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 73). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 6, 26). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of

the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. On June 4, 2013, Plaintiff filed the instant case. (Doc. 1).

FACTUAL BACKGROUND

**Personal Background and Vocational Background**

Plaintiff was 45 years old at the time of the ALJ hearing and has past relevant work experience as a cashier, stocker, and cleaner. (Tr. 34, 55-57, 176). He has a third grade education, cannot read or write in any language, and speaks primarily Arabic. (Tr. 59, 175). Nevertheless, he was able to operate a cash register for almost 30 years, communicated effectively in English, and paid bills. (Tr. 34, 39-40, 55-57, 172, 176, 189). He also had a driver's license and drove independently. (Tr. 184, 626). Generally, Plaintiff lived with his wife and their six children but stayed at his daughter's home occasionally due to marital problems. (Tr. 38).

Plaintiff testified he suffered from chronic back pain which became worse in 2009. (Tr. 34). He said he spent most of the day lying down and could sit and stand for an hour, but needed to change positions often. (Tr. 36, 42, 45). Despite rating his knee, back, and chest pain as a 10/10 on both good and bad days, Plaintiff said he jogged "when he felt very good." (Tr. 44, 230). He also climbed a flight of stairs to use the bathroom. (Tr. 44). Plaintiff was able to handle personal care and occasionally dressed his five-year old daughter for school. (Tr. 188, 197). His older daughter reported Plaintiff slept most of the day, watched television, and was angry all the time due to his condition. (Tr. 185-95).

**Physical Medical Evidence**

Rebecca Reyes, M.D., provided an undated questionnaire listing Plaintiff's diagnoses and limitations. (Tr. 280-81). On the questionnaire, Dr. Reyes indicated Plaintiff was a chronic heavy

2

smoker and had chronic back pain due to tethering of the spina bifida and a herniated disc. (Tr. 280). She also noted Plaintiff underwent an L4-L5 decompression and foraminotomy, had two stents, and suffered from chronic right knee pain. (Tr. 280). Dr. Reyes indicated Plaintiff had no improvement in back pain despite epidurals, pain medication, and pain management. (Tr. 280-81). Dr. Reyes concluded Plaintiff could not walk, sit down, or stand due to chronic severe back, knee, and chest pain. (Tr. 281). She also said he could not bend, stoop, or lift heavy things because of back pain. (Tr. 281).

With the functional opinion, Dr. Reyes provided treatment notes from one emergency room visit in 2008, where Plaintiff complained of chest pain due to pneumonia (Tr. 284-85). She also included consultations from cardiologists and co-workers from 2006 and 2008. (Tr. 286-87, 288-93). Those consultations, which formed the basis of Dr. Reyes' functional opinion, showed Plaintiff complained of severe, debilitating back pain (Tr. 281, 290-93; Tr. 280, Question 5); however, examinations generally yielded normal function results and Plaintiff did not "grimace or look like he [was] in significant pain" and was able to move without difficulty (Tr. 290, 291-93). Moreover, no atrophy was present, knee motion was intact, and motor testing was normal. (Tr. 290, 292-93). Finally, an MRI revealed mild stenosis at L1-L2, mild bulging at L4, and diastematomyolia with a tethered cord; but no disc herniation or spinal stenosis. (Tr. 288).

In May, June, and July 2008, Plaintiff underwent a series of lumbar nerve block procedures at the Cleveland Clinic after reporting severe back pain. (Tr. 299, 311). Notably, despite reporting back pain as a 10/10 (Tr. 306, 311), Plaintiff was working as a cashier during this time (Tr. 627). Plaintiff reported "excellent relief" from the procedures. (Tr. 299, 302). Generally, treatment notes revealed intact muscle strength, mildly limited spinal range of motion, and no pain to palpation over the spine. (Tr. 303, 308).

3

Plaintiff went to St. John West Shore Emergency Room (St. John), Fairview General Hospital (Fairview), or MetroHealth (Metro) frequently in 2008 and 2009 with either complaints of back or chest pain, fully described below. Notably, Plaintiff's physical examinations were generally normal and diagnostic testing was unremarkable. Moreover, treatment providers frequently recommended methadone as opposed to pain medication, and noted Plaintiff's opioid use showed a pattern of misuse and abuse.

Plaintiff sought treatment at St. John on May 7, 2008, complaining of chest and back pain. (Tr. 521). His chest pain subsided, and he described his back pain as "a severe stabbing pain." (Tr. 521). On examination, Plaintiff was able to walk with a normal gait, stand on his toes, and lumbar extension was normal. (Tr. 522, 525). Dr. Kabbara recommended methadone as opposed to opioids, which Plaintiff refused. (Tr. 523). He recommended Plaintiff establish care with the Pain Clinic "to centralize the prescription of opioid and the anti[-]neuropathic medications through one practitioner." (Tr. 523).

On May 31, 2008, Plaintiff sought treatment at St. John with complaints of chest pain, vomiting, shortness of breath, and dizziness. (Tr. 518). Despite these complaints, Plaintiff was stable on presentation, and he had a regular heart rate and unremarkable physical examination. (Tr. 518). He was treated with Tylenol and Morphine (for breakthrough pain), remained stable, and was discharged in stable condition. (Tr. 518). His final diagnosis was "atypical chest pain resolved." (Tr. 519).

On June 20, 2008, Plaintiff returned to St. John with complaints of back pain. (Tr. 513-14). He was given pain medication and felt better. (Tr. 516). Plaintiff also saw Dr. Kabbara. After Plaintiff refused methadone, Dr. Kabbara recommended steroid block injections. (Tr. 514). Dr. Kabbara noted Plaintiff had recently received injections at the Cleveland Clinic. (Tr. 513-

4

514). However, despite Plaintiff's prior reports of "excellent relief" from the procedures, Plaintiff told Dr. Kabbara they had not provided relief. (Tr. 513-14). Dr. Kabbara noted Plaintiff "should not be given IV opioids" due to "misuse and abuse of the medication." (Tr. 514).

Plaintiff returned to St. John with complaints of chest pain and pneumonia on September 19, 2008. (Tr. 503). While he denied smoking on admission (Tr. 508), he later admitted to smoking a pack of cigarettes a day (Tr. 506). A cardiac work-up was unremarkable and a chest x-ray showed congestion. (Tr. 503, 508). Douglas Long, P.A., noted Plaintiff's pain description was atypical for cardiologic pain. (Tr. 503). Plaintiff was diagnosed with bronchitis, his condition improved, and he was discharged in stable condition. (Tr. 503).

On October 4, 2008, Plaintiff returned to St. John with complaints of chest pain. (Tr. 500). He was stable on presentation, his heart rate was normal, and his physical examination unremarkable. (Tr. 500). Plaintiff reported smoking one pack of cigarettes per day, "but ha[d] a considerable smoking history of 3 packs per day in the past". (Tr. 500). Plaintiff was treated with aspirin, beta blockers, nitro, and cardiopulmonary monitoring. (Tr. 500). He was discharged in stable condition. (Tr. 501).

Plaintiff returned to St. John the following week, on October 15, 2008, with complaints of chest pain. (Tr. 494). Again, Plaintiff was stable on presentation, his physical examination was unremarkable, and he was treated with aspirin, beta blockers, nitro and cardiopulmonary monitoring. (Tr. 494). Plaintiff was referred to Tina Ellison, P.A., the following day. (Tr. 497). Despite complaints of severe back pain, a physical examination revealed intact and full motor strength, normal straight leg testing, and normal lumbar range of motion. (Tr. 497). Ms. Ellison noted Plaintiff had "chronic back pain and chronic opioid use with a pattern suggestive of potential for misuse and abuse of narcotics." (Tr. 497). Ms. Ellison recommended discontinuing

5

opioid medication and using methadone and over the counter Tylenol in its place, as well as enrolling in a detoxification program. (Tr. 498).

In February 2009, Plaintiff sought treatment at Metro for non-cardiac chest pain. (Tr. 320). Plaintiff reported prior placement of two stents; however, after catheterization and review of records, Metro providers revealed Plaintiff previously underwent an angioplasty without stent placement. (Tr. 320). Plaintiff reported he was a heavy smoker, who "continu[ed] to smoke as he has a lot of life stressors." (Tr. 320, 322).  Plaintiff's chest pain resolved and he was sent home stable condition. (Tr. 320).

In April 2009, Plaintiff presented to St. John with complaints of back pain. (Tr. 491-92). Dr. Kabbara stated he had seen Plaintiff on multiple occasions in the past year. (Tr. 491). Despite complaints of back pain, Dr. Kabbara noted Plaintiff walked with a normal gait and there was no evidence of weakness in his lower extremities. (Tr. 491). Plaintiff complained his regimen of pain medication was not beneficial. (Tr. 491). Dr. Kabbara had a "long discussion" with Plaintiff about discontinuing his opioid therapy. (Tr. 491). Plaintiff declined methadone so Dr. Kabbara gave him information about a pain stimulator. (Tr. 491). Dr. Kabbara declined to prescribe pain medication. (Tr. 492).

In May and July 2009, Plaintiff presented to Fairview for chest and back pain. (Tr. 435-38). On examination, Plaintiff asked for pain medication. (Tr. 435). Both physical examinations revealed normal functional findings, including normal straight leg testing. (Tr. 436). An EKG and chest x-rays were also normal. (Tr. 437). A May 2009 x-ray of Plaintiff's right knee was unremarkable. (Tr. 484).

Plaintiff returned to St. John on July 7, 2009 for an angiogram. (Tr. 527). The results were generally normal and Dr. Hussain recommended "mild medical management." (Tr. 527-28).

From December 2008 to December 2009, Plaintiff saw Dr. George E. Girgis, D.O., for pain management. (Tr. 619). Plaintiff's examinations generally revealed normal muscle strength but restricted range of lumbar motion. (Tr. 566-67, 572, 576, 581, 586, 591, 596, 601-02, 607-08). In March 2009, Plaintiff reported severe back and hip pain but said he was working full-time, which involved mostly standing. (Tr. 579). In April 2009, Dr. Girgis agreed with Dr. Kabbara's recommendation for a spinal cord stimulator and said he would start weaning Plaintiff off opioid medication. (Tr. 589, 594). However, in May 2009, Plaintiff reported "new complaints of right leg pain" and said "his [pain] medications [were] helping [] his pain and helping him function daily." (Tr. 590).

In July 2009, Dr. Girgis was "surprised to learn [Plaintiff] was multisourcing for Vicodin." (Tr. 611). Dr. Girgis "had a long discussion with [Plaintiff] regarding this problem" and said he could no longer prescribe narcotics. (Tr. 611). In October 2009, Dr. Girgis "gave [Plaintiff] the benefit of the doubt" and signed another pain medication agreement. (Tr. 617). However, by December 2009, Dr. Girgis "checked the OARRS report and [] was surprised that [Plaintiff] [was] still multisourcing!!!" (Tr. 617). Although he denied this, Plaintiff had filled two scripts of Vicodin while he traveled out of the country. (Tr. 617).  And despite Dr. Girgis' apparent discontent, Plaintiff requested Percocet and the request was denied. (Tr. 617). Dr. Girgis said he would no longer perform the stimulator implantation or prescribe narcotics and recommended a multi-skeletal examination. (Tr. 617). He tried to contact Dr. Reyes, but her office was closed. (Tr. 617).

On October 3, 2009, Plaintiff sought treatment at St. John for "sharp, fleeting chest pain." (Tr. 488). On examination, there was no murmur and his heart rhythm was regular. (Tr. 488). He was discharged and instructed to follow-up for GERD testing. (Tr. 488).

Examinations of Plaintiff's knees in January 2010 were unremarkable and revealed a "normal right knee." (Tr. 479-80, 534-35). Plaintiff had no acute pathology, normal bone density, no fracture or alignment, and no knee effusion. (Tr. 480). However, on December 22, 2010, Plaintiff underwent right knee arthroscopic knee surgery for a right medial meniscus tear. (Tr. 761).

Plaintiff saw Dr. Reyes consistently from January 25, 2010 through October 7, 2010. (Tr. 641-49, 720-24). Unfortunately, the treatment notes are largely unintelligible and generally only listed Plaintiff's medications, complaints of pain, and emergency room visits. (*Id*.). On October 7, 2010, Dr. Reyes noted Plaintiff had been out of the country and complained of chest congestion. (Tr. 649).

On April 5, 2010, state agency physician W. Jerry McCloud, M.D., provided an assessment of Plaintiff's physical ability to perform work-related activities. (Tr. 633-40). Dr. McCloud found Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand, sit, and/or walk about six hours in an eight-hour workday; and push or pull without limitation. (Tr. 634). Plaintiff could never balance and should avoid even moderate exposure to hazards but he had no other postural limitations, nor did he have any manipulative, visual, or communicative limitations. (Tr. 635-37). State agency physician Gerald Klyop, M.D., affirmed this assessment as written on November 22, 2010. (Tr. 742-43).

Plaintiff saw Dr. Hussain for consultation regarding his chest pain in April 2010 and July 2010. (Tr. 662, 752). In April, Dr. Hussain noted Plaintiff was well built and well nourished,

appeared comfortable, and was in no acute distress. (Tr. 662). An EKG and chest x-ray were normal. (Tr. 662). Dr. Hussain diagnosed "chest pain with atypical features." (Tr. 662). In July, test results revealed normal function. (Tr. 752-53).

On June 3, 2010, Plaintiff went to Lutheran Medical Center with complaints of chest pain, which occurred "while dancing." (Tr. 681, 684). Examinations revealed normal lung and heart function despite diagnoses of coronary artery disease and presence of bilateral pneumonia. (Tr. 682, 694). After reporting placement of two stents, attending physician Dr. Atat called Plaintiff's cardiologist, who reported Plaintiff did not have stents previously placed. (Tr. 682). Follow-up July 2010 chest examinations with Dr. Hussain were unremarkable. (Tr. 733-35).

Plaintiff sought treatment from Irwin Mandel, M.D., on June 28, 2010, with complaints of left knee pain. (Tr. 740). Despite complaints of pain, Plaintiff had a normal gait, normal axial alignment, normal tracking of the patella, no instability, and no effusion. (Tr. 740). Dr. Mandel prescribed Naproxen. (Tr. 740). Plaintiff followed up with Dr. Mandel in August 2010. (Tr. 739). Dr. Mandel diagnosed right knee internal derangement with no effusion and recommended an MRI. (Tr. 739).

In November 2010, Plaintiff saw Dr. Steinmetz, his previous back surgeon, with complaints of back pain. (Tr. 744). Dr. Steinmetz recommended a spinal cord stimulator trial. (Tr. 744). Notably, Plaintiff requested a new pain management physician and was referred to Dr. Mekhail. (Tr. 744).

Plaintiff returned to St. John with complaints of chest pain in December 2010. (Tr. 762). On presentation, he was stable with regular heart rate. (Tr. 762). Testing was normal and Plaintiff was discharged. (Tr. 762).

Plaintiff sought treatment for pain management at Cleveland Clinic's Pain Management Center on February 24, 2011. (Tr. 1033-36). Plaintiff had full range of motion in his extremities and spine, no pain to palpation over the spine, a normal gait, and demonstrated normal toe and heel walking. (Tr. 1035). Dr. Avhad recommended a spinal cord stimulator trial, exercise, tobacco cessation, and noted he would "not be responsible for prescribing [Plaintiff] Percocet." (Tr. 1036).

On April 2, 2011, Plaintiff was taken to St. John after overdosing on back pain medication. (Tr. 948-55). Plaintiff was very combative during his stay and had to be restrained. (Tr. 954-55). After he was stabilized, he was sent home with family. (*Id*.).

Plaintiff underwent a spinal cord stimulator trial on May 11, 2011. (Tr. 1039-41). Plaintiff reported a decrease in pain post-procedure. (Tr. 1040-41, 1044). Subsequently, the stimulator was surgically implanted in June 2011. (Tr. 1059-61). At his follow-up, Plaintiff said his symptoms persisted and believed the battery was depleted. (Tr. 1066). He had also been requesting additional post-operative pain medication. (Tr. 1066).

On August 18, 2011, Plaintiff again sought treatment at St. John for chest pain. (Tr. 934). On examination, Plaintiff had regular heart rate and rhythm with good bilateral air entry. (Tr. 935). He had full motor strength in his upper and lower extremities. (Tr. 935). Plaintiff was given a morphine IV and aspirin, which relieved the pain. (Tr. 937). Testing was normal and Plaintiff was referred to Dr. Hussain. (Tr. 935, 940, 968-69). A lumbar x-ray revealed mild disc space narrowing at C4/5 and C5/6 but was otherwise unremarkable. (Tr. 943).

Plaintiff saw Drs. Stotts and Leizman at the Cleveland Clinic on September 30, 2011. (Tr. 1068). Dr. Stotts noted the stimulator battery was "apparently defective" and was set to be replaced in October 2011. (Tr. 1068). Plaintiff requested Dr. Leizman fill out a disability form.

(Tr. 1072). Drs. Stotts and Leizman noted Plaintiff was capable of sedentary-type work duties. (Tr. 1072).

Daniel J. Leizman, M.D., prepared a medical source statement regarding Plaintiff's work-related abilities on October 7, 2011. (Tr. 957-58). Dr. Leizman found Plaintiff could frequently and occasionally lift ten pounds; stand and/or walk a total of two hours, but only fifteen minutes without interruption; sit a total of eight hours, but only 30 minutes without interruption; needed an at-will sit/stand accommodation; and could rarely engage in postural activities. (Tr. 957). Plaintiff could rarely push or pull, occasionally reach, and frequently handle, feel, and engage in fine and gross manipulation. (Tr. 958). He should avoid heights, moving machinery, and temperature extremes. (Tr. 958).  Although requested on the form, Dr. Leizman did not provide any medical findings to support his assessment. (Tr. 957-58). Dr. Leizman concluded Plaintiff could perform sedentary work. (Tr. 958). However, Dr. Leizman's treatment notes revealed that the battery in Plaintiff's spinal cord stimulator was "apparently defective" during the time of this evaluation and was scheduled to be repaired later that month. (Tr. 1068-72). Indeed, Plaintiff had the battery replaced in the stimulator on October 25, 2011. (Tr. 1094-1097).

Plaintiff returned to St. John with chest pain on November 14, 2011. (Tr. 988). Chest x-rays revealed a normal heart with mild congestion. (Tr. 995).

**<u>Mental Medical Evidence</u>**

On March 30, 2010, Plaintiff saw clinical psychologist Deborah A. Koricke, Ph.D., for a disability assessment report. (Tr. 625). Plaintiff reported having seven stents placed in his heart six months prior; however, there is no evidence in the record to validate this statement. (Tr. 627). He reported no history of psychiatric treatment, but said he had depression that began two-to-three years prior. (Tr. 627). On examination, Plaintiff was polite, cooperative, friendly, happy,

11

pleasant, good-natured, engaged easily, and "showed no depression or anxiety symptoms" despite being sad that he could not work. (Tr. 628). He demonstrated good insight and judgment, had logical and linear thinking, and good social judgment. (Tr. 628-29). Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) examination results revealed a full scale IQ score of 69. (Tr. 625, 629). This score is in the mild mental retardation range of intellectual ability; however, Dr. Koricke found Plaintiff was "estimated to function more in the low average to average range, based on nonverbal test scores." (Tr. 628-29). Dr. Koricke gave no diagnosis and assigned Plaintiff a global assessment of functioning (GAF) score of 80.[1] (Tr. 629).

On May 4, 2010, state agency physician Joan Williams, Ph.D., prepared a psychiatric review technique and found no medically determinable impairment. (Tr. 667).

Jill Mushkat, Ph.D., evaluated Plaintiff on March 4, 2011, to determine whether he was an appropriate candidate for a spinal cord implant. (Tr. 1029-32). Plaintiff "was able to sit throughout the session", "demonstrated a good sense of humor", had good attention, and was friendly, pleasant, and cooperative. (Tr. 1030). Plaintiff reported he was depressed and angry. (Tr. 1030). Based on Beck Depression Inventory test results, Dr. Mushkat determined Plaintiff appeared to have anxiety, a great deal of depression, and some traumatic stress. (Tr. 1031). Dr. Mushkat suggested Plaintiff was a viable candidate for a stimulator. (Tr. 1031-32). While unable to define Plaintiff's mental status, Dr. Mushkat found Plaintiff appeared to have major depressive and pain disorders. (Tr. 1031). However, she also noted Plaintiff's psychological testing should be viewed with some caution due to reading and language issues. (Tr. 1031).

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 80 indicates that if symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument); and no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in school work). *DSM-IV-TR*, at 34.

Six months later, Dr. Mushkat prepared a medical source statement of Plaintiff's mental ability to conduct work-related activity. (Tr. 926-27). Here, Dr. Mushkat found Plaintiff had a good ability to use good judgment; understand, remember, and carry out simple job instructions; maintain appearance; relate predictably in social situations; manage funds and schedules; and leave home on his own. (Tr. 926-27). She found he had a fair ability to socialize; carry out detailed, but not complex instructions; understand complex instructions; follow work rules; respond to change; deal with the public; relate to coworkers; function independently; and work in coordination with others. (Tr. 926-27). He had a poor ability to maintain attention, regular attendance, and deal with work stress. (Tr. 926). Dr. Mushkat concluded Plaintiff was very depressed and had difficulty with anxiety and chronic pain, which made him unable to work. (Tr. 927).

**ALJ Decision**

The ALJ determined Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine status post laminectomy, status post right knee meniscus tear, and single vessel coronary artery disease. (Tr. 11). Despite these impairments, the ALJ found Plaintiff had the residual functional capacity (RFC) to perform medium work with the following limitations: he could not climb ladders, ropes, or scaffolds; should avoid moderate exposure to hazards such as operation and control of moving machinery and unprotected heights; and could perform simple, routine, and repetitive tasks. (Tr. 13).

In making this finding, the ALJ cited the exhibit containing Dr. Reyes' opinion and said that "the entire medical record reveal[ed] a long-standing history of back pain that predate[d] the alleged onset period by years", but did not specifically discuss Dr. Reyes' opinion. (Tr. 14). The ALJ did note that Plaintiff's physical examinations were overwhelmingly normal despite

13

coinciding with severe complaints of pain. (Tr. 14-18). He also noted Plaintiff's consistent requests for strong narcotic pain medication to various medical providers, despite reporting these medications did not control his pain. (Tr. 14-18).

Based on VE testimony, the ALJ found Plaintiff could perform work as a hand packager, laundry worker, and circuit board assembler, and thus he was not disabled. (Tr. 18).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform past relevant work?

5.   Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id*. The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ's treatment of various medical opinions was flawed: specifically, the opinions of his treating physicians, Drs. Reyes and Leizman; Dr. Mushkat's consultive opinion; and certain state agency physician opinions. Plaintiff also argues the ALJ

mischaracterized the evidence concerning Plaintiff's complaints of pain. (Doc. 15, at 14). The Court addresses each argument in turn.

***Treating Physician Rule***

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id*. The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id*. A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (citing *Rogers*, 486 F.3d at 243). Accordingly, failure to give good reasons requires remand. *Id*. at 409–410.

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

16

"If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. § 416.902. This includes a consultative examiner. § 416.902.

Last in the medical source hierarchy are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. § 416.902. This includes state agency physicians and psychologists. § 416.902. The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. § 416.927.

**Dr. Reyes**

Plaintiff avers Dr. Reyes questionnaire is dated March 30, 2010 due to a fax sheet signed by Dr. Reyes that same day. (Doc. 15, at 7; Tr. 297). The Commissioner argues this was merely the fax date and that the opinion was provided before the relevant onset period due to its reliance on outdated medical records. (Doc. 16, at 10). The Court finds March 30, 2010 is the day Dr.

17

Reyes ostensibly gave the opinion. This deduction is made because the Social Security Administration ("SSA") sent Dr. Reyes a letter on February 2, 2010, requesting medical records and a functional limitation opinion. (Tr. 296-97). This letter references vendor number "0114176" and case number "2861241" at the top right of the letter. (Tr. 296). Notably, these same case and vendor numbers are located at the top left hand corner of Dr. Reyes' functional opinion form. (Tr. 280-81). Therefore, while the opinion is not dated, it logically follows, based on the correlation of case numbers on the request letter and the opinion form, Dr. Reyes' opinion was provided at the request of the SSA and provided after February 2, 2010, as part of Plaintiff's current disability application and after the alleged onset date.

The Commissioner's sole argument is that ALJ was not required to discuss Dr. Reyes' opinion because it predated the alleged onset period. (Doc. 16, at 9-10). However, as noted above, the Court finds this opinion was provided within the alleged onset period; and it is clear the ALJ did not address it. While the opinion itself is borderline deficient[2], the ALJ still had a duty to discuss it, and his failure to do so was not harmless. *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006). The Court is cognizant that remand might be an exercise in futility; however, the importance of the treating physician rule, in this case, trumps any "judicial ping-pong" that may occur. *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004). For these reasons, the ALJ's failure to reference Dr. Reyes' opinion requires remand.

2. Dr. Reyes found Plaintiff suffered from a herniated disc (Tr. 280), despite including an MRI which showed "no disc herniation or spinal stenosis." (Tr. 288). In addition, Dr. Reyes concluded Plaintiff could not walk, sit down, or stand due to chronic severe back pain, despite explicitly relying on consultations which revealed Plaintiff did not "grimace or look like he [was] in significant pain", he was able to move without difficulty, and he was working as a cashier. (Tr. 280-81 *contra* Tr. 290-93). Moreover, knee motion was intact and straight leg raise and motor testing were normal. (Tr. 290-93). Next, Dr. Reyes said Plaintiff had no improvement in his back despite epidurals. (Tr. 280-81). However, records indicated epidurals provided "excellent relief." (Tr. 299, 302). Notably, Dr. Reyes failed to provide any treatment records of her own to support these restrictive findings, and chose only to use consultations which contradicted her opinion.

18

**Dr. Leizman**

Next, Plaintiff claims the ALJ erred by affording little weight to Dr. Leizman. (Doc. 15, at 16-19). The ALJ afforded Dr. Leizman's opinion little weight because it was based on Plaintiff's subjective complaints, was contrary to treatment notes, failed to provide a detailed rationale, and was given during a time Plaintiff's stimulator was defective. (Tr. 15-16).  Plaintiff avers that while Dr. Leizman's opinion does not provide rationale, his treatment notes supported his opinion. (Doc. 15, at 16-18). However, the question is not whether there is evidence that supports a claimant's position; rather, the Court must decide whether "substantial evidence [] supports the conclusion reached by the ALJ." *Jones*, 336 F.3d 469, 477 (6th Cir. 2003). Here, the Court finds that the ALJ met his legal obligation to provide reasons for affording Dr. Leizman's opinion little weight, and those reasons are supported by substantial evidence.

Contrary to Plaintiff's position, the ALJ's finding that Dr. Leizman's evaluation was given during a time when Plaintiff's stimulator was defective was not speculative; rather, it was evidenced by the record. Indeed, Dr. Leizman's treatment notes revealed the battery was defective during the same appointment Plaintiff presented with disability paperwork. (Tr. 1068).

Moreover, the ALJ pointed to record evidence which contradicted Dr. Leizman's opinion. To that end, the ALJ discussed treatment notes which revealed normal physical examination findings, including negative straight leg raising in the sitting and supine positions, no pain to palpation over the spine, normal back range of motion without pain reproduction, full and pain-free range of motion in extremities, no atrophy or tone abnormalities, and normal toe walking, heel walking, and gait. (Tr. 16 *referring to* Tr. 1035). In addition, a variety of different treatment providers at various medical facilities provided treatment notes which continually showed normal physical and objective examination findings despite complaints of severe back and chest

pain. (Tr. 288, 290-93, 303, 308, 436, 491, 494, 497, 518, 522, 525, 572, 576, 596, 1035). Accordingly, there is overwhelming and substantial evidence to support the ALJ's decision to afford little weight to Dr. Leizman's restrictive assessment.

**Dr. Mushkat**

The ALJ gave no weight to Dr. Mushkat's mental health opinion because: she suggested her own opinion be viewed very cautiously due to language and reading barriers; she could not provide a definitive impression of Plaintiff's mental status; she relied heavily on subjective complaints; and she only saw Plaintiff once. (Tr. 12). Plaintiff, however, argues this reasoning is flawed because Dr. Mushkat administered objective testing and diagnosed Plaintiff with depressive disorder. (Doc. 15, at 24-25).

Plaintiff's arguments are without merit. Dr. Mushkat said it "appeared" that Plaintiff had major depressive disorder based on test scores; however, she explicitly stated, twice, that these test scores should be viewed cautiously. (Tr. 1031). Thus, the scores were not an accurate assessment of Plaintiff's mental health pursuant to the doctor who administered the test. Moreover, Dr. Mushkat's limitations were internally inconsistent. For example, although Dr. Mushkat found Plaintiff had a poor ability to maintain attention and concentration, in the same opinion she said he had good judgment, and a good ability to understand, remember, and carry out simple job instructions; maintain appearance; relate socially; and manage funds. (Tr. 926-27).  She also found Plaintiff had a fair ability to understand, remember, and carry out complex job instructions and make occupational adjustments. (Tr. 926-27).

Finally, the ALJ did not err by affording Dr. Koricke more weight, despite his status as a one-time examining physician. Indeed, much of Dr. Koricke's examination was consistent with Dr. Mushkat's, except for the extreme limitations. For example, Plaintiff was polite, cooperative,

friendly, happy, pleasant, good-natured, engaged easily, and "showed no depression or anxiety symptoms", demonstrated good insight and judgment, had logical and linear thinking, and good social judgment. (Tr. 628-29). Accordingly, the ALJ's reasoning was not flawed with respect to Dr. Mushkat's opinion.

**State Agency Physicians**

Plaintiff also argues the ALJ erred by "apparently giving great weight" to the non-examining, state agency physicians. (Doc. 15, at 21-23); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013). The Commissioner does not address this argument.

Here, the ALJ noted the state agency physician opinions were "internally consistent and consistent with the evidence as a whole." (Tr. 16). While the Court agrees with the ALJ's assessment of the state agency physicians[3], it must remand this portion of the ALJ's decision to await further analysis of Dr. Reyes' opinion. *See Gayheart*, 710 F.3d 365 at 376 (An ALJ may afford weight to a nonexamining or nontreating source "but only if a treating-source opinion is not deemed controlling.").[4]

---

3. Both state agency physicians reviewed the medical records and found that they showed normal or unremarkable examination, functional, and objective findings. (Tr. 634, 742-43). Plaintiff's argument that these opinions were offered "well before the completion of the record" is unpersuasive. First, both opinions, dated April 5, 2010 and November 22, 2010, were offered well within the relevant time period. (Tr. 633-40, 742-43). Moreover, the medical evidence they reviewed was consistent with the medical evidence provided after they rendered their opinions. To that end, the record shows Plaintiff complained of the same level of debilitating back pain, both before his onset date and throughout the relevant period, despite consistently normal objective, functional, and physical examination findings. (Tr. 288, 290-93, 303, 308, 436, 491, 494, 497, 518, 522, 525, 572, 576, 596, 662, 733-35, 740, 762, 935, 943, 995, 1035).

4. This reasoning does not apply to Dr. Mushkat's consultive opinion because that opinion involved an assessment of Plaintiff's mental health, as opposed to the physical limitation assessment provided by Dr. Reyes.

***Pain and Credibility***

The Sixth Circuit recognizes that pain alone may be disabling. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). However, an ALJ is not required to accept a claimant's own testimony regarding his pain. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* Social Security Ruling (SSR) 96-7p, 1996 WL 374186. For pain or other subjective complaints to be considered disabling, there must be: 1) objective medical evidence of an underlying medical condition; and 2) objective medical evidence that confirms the severity of the alleged disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). This standard does not require "objective evidence of the pain itself." *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

A plaintiff's failure to meet the above-stated standard does not necessarily end the inquiry. Rather, "in the absence of objective medical evidence sufficient to support a finding of disability, the claimant's statements about the severity of his or her symptoms will be considered with other relevant evidence in deciding disability." *Swain v. Comm. of Soc. Sec.*, 297 F. Supp. 2d 986, 989 (N.D. Ohio 2003) (citing SSR 96-7p).

The ALJ is to consider certain factors in determining whether a claimant has disabling pain: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication to relieve pain; and 6) any measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See*

*Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, at *13 (N.D. Ohio 2012).

Further, an "ALJ is not required to accept a claimant's subjective complaints" and may "consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting Walters, 127 F.3d at 531*); see also Warner v. Comm'r of Soc. Sec*., 375 F.3d 387, 392 (6th Cir. 2004) ("we accord great deference to [the ALJ's] credibility determination.").

Here, Plaintiff argues the ALJ erred because he only considered "relatively weak medical evidence" when determining Plaintiff's pain and credibility. (Doc. 15, at 21). However, this is simply untrue. In assessing Plaintiff pain and credibility, the ALJ discussed normal physical examination findings; normal functional examinations; abuse of narcotics by obtaining "a large amount of narcotic pain medications" from multiple physicians; certain physicians' refusal to prescribe pain medication due to abuse and multisourcing; the fact Plaintiff was able to travel outside the country, which did not comport with his daily activity reports; *and* objective evidence. (Tr. 12-17).

The medical evidence fully supports the ALJ's pain and credibility finding. Indeed, Plaintiff's medical records revealed Plaintiff multisourced to obtain narcotic medication, he overdosed on narcotic medication, and certain physicians began refusing to prescribe medication. (Tr. 491-92, 497-98, 514, 523, 611, 617). Moreover, despite reporting constant and severe pain, he traveled out of the country and his physical examination findings consistently revealed a

normal gait, normal range of motion, full muscle strength, and no atrophy. (Tr. 290-93, 303, 308-09, 436, 491, 497, 518, 522, 525, 935, 1035, 1036). Indeed, these normal physical examinations coincided with generally unremarkable, or "relatively weak", objective findings.  Even without assigning weight to Dr. Reyes' functional opinion, the ALJ's credibility finding is more than substantially supported by the record. *See Jones*, 336 F.3d at 477. In sum, the ALJ complied with the regulations, and his credibility finding is supported by substantial evidence.

<h3 style="text-align:center">CONCLUSION</h3>

Following review of the arguments presented, the record, and applicable law, the Court affirms the ALJ's credibility determination and his decision concerning Drs. Leizman and Mushkat's opinions. However, the Court remands the portion of the ALJ's decision concerning Dr. Reyes and the state agency opinions pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this memorandum and opinion.

IT IS SO ORDERED.

 s/James R. Knepp II
United States Magistrate Judge